## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW
Suite 7100
Washington, DC 20530

*Plaintiff,*

v.

BBA AVIATION PLC
105 Wigmore Street
London, UK
W1U 1QY England,

LANDMARK U.S. CORP LLC
1001 Pennsylvania Avenue, NW
Suite 220 South
Washington, DC 20004,

and

LM U.S. MEMBER LLC
1001 Pennsylvania Avenue, NW
Suite 220 South
Washington, DC 20004

*Defendants.*

## <u>COMPLAINT</u>

The United States of America, acting under the direction of the Attorney General of the

United States, brings this civil antitrust action to enjoin the proposed acquisition by BBA

Aviation plc ("BBA"), operating in the United States through its subsidiary Signature Flight

Support Corporation ("Signature"), of Landmark U.S. Corp LLC and LM U.S. Member LLC,

collectively doing business as Landmark Aviation ("Landmark"), and to obtain other equitable relief.  The United States alleges as follows:

## I.

## NATURE OF THE ACTION

1.   On September 23, 2015, BBA and Landmark signed an agreement for BBA to acquire all of the equity interests in Landmark, including Landmark's fixed-base operator locations ("FBOs"), for approximately $2.065 billion.  FBOs sell aviation fuel and provide flight support services to general aviation customers.  BBA, through Signature, operates approximately 70 FBOs at airports across the United States.  Landmark operates FBOs at approximately 60 airports in the United States.  Both Signature and Landmark operate FBOs at Washington Dulles International Airport ("IAD") located in Dulles, Virginia; Scottsdale Municipal Airport ("SDL") located in Scottsdale, Arizona; Fresno Yosemite International Airport ("FAT") located in Fresno, California; Jacqueline Cochran Regional Airport ("TRM") located in Thermal, California; Westchester County Airport ("HPN") located in White Plains, New York; and Ted Stevens Anchorage International Airport ("ANC") located in Anchorage, Alaska.

2.   Signature and Landmark are the only two full-service FBOs operating at IAD, SDL, and FAT, and two of only three full-service FBOs operating at TRM, HPN, and ANC.  At each of these six airports, Signature and Landmark compete directly on price and quality of FBO services.  The proposed acquisition would eliminate this head-to-head competition, resulting in higher prices and lower quality of services for general aviation customers at each airport.

3.   Accordingly, BBA's proposed acquisition of Landmark is likely to lessen competition substantially in the markets for full-service FBO services at IAD, SDL, FAT, TRM, HPN, and ANC in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II.

## JURISDICTION AND VENUE

4.      The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  This Court has subject matter jurisdiction over this action and jurisdiction over the parties pursuant to 15 U.S.C. § 25 and 28 U.S.C. §§ 1331, 1337(a), and 1345.

5.      Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce.  Signature and Landmark market and sell their products and services, including their FBO services, throughout the United States and regularly transact business and transmit data in connection with these activities in the flow of interstate commerce.

6.      Defendants have consented to venue and personal jurisdiction in this District.  This Court has personal jurisdiction over each Defendant and venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c).

## III.

## DEFENDANTS AND THE PROPOSED TRANSACTION

7.      BBA is a United Kingdom public limited company headquartered in London, England.  BBA operates in the United States through its subsidiary, Signature, a Delaware corporation headquartered in Orlando, Florida.  Signature has the largest FBO network in the United States and in the world.  It owns or operates approximately 70 FBO facilities in the United States, including FBO operations at IAD, SDL, FAT, TRM, HPN, and ANC.  BBA had worldwide revenues of approximately $2.3 billion in 2014, of which over $900 million were derived from Signature's U.S. FBO business.

8.      Landmark U.S. Corp. and LM U.S. Member are Delaware limited liability companies with their headquarters in Houston, Texas and together comprise the companies doing business as Landmark.  They are subsidiaries of CP V Landmark II, L.P. and CP V Landmark, L.P, respectively, which are both Delaware limited partnerships affiliated with the Carlyle Group. Landmark has the third-largest FBO network in the United States, where it owns and operates approximately 60 FBO facilities, including FBO operations at IAD, SDL, FAT, TRM, HPN, and ANC.  Landmark had worldwide revenues of over $700 million in 2014, of which over $500 million were derived from its U.S. FBO business.

9.      On September 23, 2015, BBA and Landmark executed a Securities Purchase Agreement under which BBA agreed to acquire all of the equity interests in Landmark for approximately $2.065 billion.

## IV.

## TRADE AND COMMERCE

### A.      The Relevant Market

10.      An FBO is a commercial business that is granted the right by a local airport authority to sell fuel and provide related support services to general aviation customers.  General aviation customers include charter, private, and corporate aircraft operators, as distinguished from scheduled commercial passenger and cargo airline operators.  General aviation customers cannot obtain FBO services except through the FBOs authorized to sell such services by each local airport authority.

11.      Full-service FBOs sell aviation fuel, including at least jet aviation fuel ("Jet A") and typically also aviation gasoline ("avgas"); provide fueling services, including pumping fuel into aircraft; and provide additional support services, including aircraft ground handling, aircraft

parking and storage, and passenger and crew services such as baggage handling, ground transportation, catering, concierge, conference room, and lounge services.

12.     The largest source of revenue for an FBO is fuel sales.  FBOs sell Jet A for turbine-powered aircraft, including turbojets and turboprops, and avgas for smaller, piston-powered aircraft.  Jet A comprises the vast majority of U.S. fuel consumption by general aviation customers, with avgas making up a significantly smaller portion.

13.     Full-service FBOs do not typically charge separately for certain ancillary services such as conference rooms, pilot lounges, flight planning, and transportation, and instead recover the cost of these services in the price that they charge for fuel.  Full-service FBOs do, however, often charge separately for hangar and office space rentals, aircraft parking and storage, aircraft handling, tie-down and ground services, deicing, and catering.

14.     Full-service FBOs are distinct from self-service FBOs, which require that the aircraft pilot or crew tow the aircraft and pump the fuel themselves and do not provide the full range of support services provided by full-service FBOs.  Most self-service FBOs do not sell Jet A, and those that do lack the necessary equipment to service large jet aircraft.  For the vast majority of general aviation customers, self-service FBOs are not an alternative to a full-service FBO, and a hypothetical monopolist of full-service FBO services at an airport could profitably increase prices by a significant and non-transitory amount.  Accordingly, full-service FBO services constitute a relevant product market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18.

15.     General aviation customers typically select the airport they wish to fly into based on its proximity to their ultimate destination and other convenience factors and then select an FBO from those available at that airport.  In most cases, the inconvenience and cost of flying an

aircraft to another nearby airport to refuel outweighs any difference in the fuel prices between the airports.  Thus, obtaining FBO services at another airport is not a meaningful alternative for most general aviation customers.  As a result, a hypothetical monopolist of full-service FBO services at IAD, SDL, FAT, TRM, HPN, or ANC could profitably increase prices by a significant and non-transitory amount.  Accordingly, these individual airports each constitute a relevant geographic market and section of the country under Section 7 of the Clayton Act, 15 U.S.C. § 18.

**B.**     **Anticompetitive Effects**

16.     The markets for full-service FBO services at IAD, SDL, and FAT are highly concentrated, with Signature and Landmark serving as the only two providers of full-service FBO services at each airport.

17.     The markets for full-service FBO services at TRM, HPN, and ANC are also highly concentrated, with Signature, Landmark, and a single smaller competitor serving as the only three providers of full-service FBO services at each airport.  At TRM, the third competitor is a new full-service FBO that has obtained a lease with the airport authority and begun construction of a facility, but is not expected to be fully operational until later this year.  At HPN, the other competitor is precluded by the terms of its lease with the airport authority from serving larger aircraft—which represent a significant portion of HPN's general aviation customers—and serves less than 20% of the market.  At ANC, the other competitor has not been operating as long as either Signature or Landmark and also has a market share below 20%.

18.     Market concentration often is a useful indicator of the level of competitive vigor in a market and the likely competitive effects of a merger.  The more concentrated a market, and the more a transaction would increase that concentration, the more likely it is that the transaction

would result in reduced competition and harm to consumers.  Market concentration commonly is measured by the Herfindahl-Hirschman Index ("HHI"), as explained in Appendix A.  Markets in which the HHI exceeds 2,500 points are considered highly concentrated, and transactions that increase the HHI by more than 200 points in highly concentrated markets are presumed likely to enhance market power.  Here, the proposed acquisition would substantially increase market concentration at IAD, SDL, FAT, TRM, HPN, and ANC, each of which already is highly concentrated, raising the HHI by more than 3,100 points in each market.  At IAD, SDL, and FAT, the proposed acquisition would result in an HHI of 10,000—a total monopoly—and at TRM, HPN, and ANC, the post-acquisition HHI would exceed 6,700 points in each market.

19.     Competition between the Signature and Landmark FBO facilities at IAD, SDL, FAT, TRM, HPN, and ANC currently limits the ability of each company to raise prices for FBO services.  This head-to-head competition also forces each company to offer better service to customers.  The proposed acquisition would eliminate the competitive constraint each firm imposes on the other at each airport.

20.     Consequently, the proposed acquisition would lead to a monopoly at IAD, SDL, and FAT and establish Signature as the dominant provider of full-service FBO services at TRM, HPN, and ANC, with a market share of at least 80% and the ability to exercise substantial market power.  The proposed acquisition would therefore likely result in higher prices for full-service FBO services and a lower quality of service for general aviation customers at IAD, SDL, FAT, TRM, HPN, and ANC in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

**C.      Entry**

21.     Successful entry into the provision of full-service FBO services at IAD, SDL, FAT, TRM, HPN, or ANC would not be timely, likely, or sufficient to deter the anticompetitive effects

resulting from the proposed acquisition for several reasons. First, FBO entry or expansion requires extensive lead time and capital investment to complete and there is no guarantee that the FBO provider would be able to obtain the necessary approvals and permits. Second, it often takes several years for a new FBO provider to build a significant customer base. Third, an FBO provider that wanted to enter or expand at an airport would need to secure land to build FBO facilities, obtain the approval of the airport authority and necessary permits, and construct FBO facilities prior to beginning operations. At airports where there is insufficient existing land or infrastructure to support additional FBO facilities—which is the case at least at IAD, SDL, FAT, and HPN—an FBO provider would also need to develop adjacent land and expand the airport infrastructure. Thus, successful entry or expansion at any of the individual airports at issue likely would not occur in a timely manner or be sufficient to prevent or remedy the proposed acquisition's anticompetitive effects.

## V.

## VIOLATION ALLEGED

22.     The United States hereby incorporates paragraphs 1 through 21 above.

23.     Unless enjoined, BBA's proposed acquisition of Landmark is likely to substantially lessen competition for full-service FBO services at IAD, SDL, FAT, TRM, HPN, and ANC in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, in the following ways:

(a)     all competition for full-service FBO services at IAD, SDL, and FAT will be eliminated;

(b)     actual and potential competition between Signature and Landmark for full-service FBO services at IAD, SDL, FAT, TRM, HPN, and ANC will be eliminated; and

(c)      prices for full-service FBO services for general aviation customers at IAD, SDL, FAT, TRM, HPN, and ANC will likely increase and the quality of services will likely decrease.

## VI.

## **REQUEST FOR RELIEF**

24.      The United States requests that this Court:

(a)       adjudge and decree that BBA's proposed acquisition of Landmark would be unlawful and would violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)      permanently enjoin and restrain Defendants and all persons acting on their behalf from consummating the proposed transaction or from entering into or carrying out any contract, agreement, plan, or understanding the effect of which would be to combine Signature's and Landmark's FBO facilities and assets at IAD, SDL, FAT, TRM, HPN, and ANC;

(c)      award the United States its costs for this action; and

(d)      award the United States such other and further relief as this Court deems just and proper.


Dated:  February 3, 2016.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
William J. Baer (D.C. Bar #324723)
Assistant Attorney General for Antitrust


_____
Sonia Pfaffenroth
Deputy Assistant Attorney General


_____
Patricia A. Brink
Director of Civil Enforcement

_____
James J. Tierney (D.C. Bar #434610)
Chief, Networks & Technology
Enforcement Section

_____
Aaron D. Hoag
Matthew C. Hammond
Assistant Chiefs, Networks & Technology
Enforcement Section

_____
Patricia L. Sindel* (D.C. Bar #997505)
Elizabeth Jensen
Ryan Struve (D.C. Bar #495406)
Jeffrey Negrette
Trial Attorneys, Networks & Technology
Enforcement Section

Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Phone: (202) 598-8300
Facsimile: (202) 616-8544
E-mail: patricia.sindel@usdoj.gov

*Attorney of Record

## APPENDIX  A

### *Herfindahl-Hirschman Index*

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration.  The HHI is calculated by squaring the market share of each firm competing in the relevant market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  The HHI takes into account the relative size distribution of the firms in a market.  It approaches zero when a market is occupied by a large number of firms of relatively equal size, and reaches its maximum of 10,000 points when a market is controlled by a single firm.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated, and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated.  *See* U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* § 5.3 (2010) ("Guidelines").  Transactions that increase the HHI by more than 200 points in highly concentrated markets presumptively raise antitrust concerns under the Guidelines.  *Id.*